Case number 20-5304 Hamilton County TN Emergency Communications District et al. First Level 3 Communications LLC. Oral argument not to exceed 15 minutes per side. Mr. Hitchcock for the appellants. May it please the court. I'm Rick Hitchcock with the Chattanooga Tennessee Bar. My colleagues and I represent the 15 9-1-1 districts that are the appellants in this case. Together those 15 districts provide emergency communications services to 25% of the people of the state of Tennessee. This morning I would like to discuss with you three subjects. First, the facts and inferences offered by the districts that describe tribal issues and should not be included in the denial of summary judgment. Second, more specifically, the key tribal issue. The number of lines Level 3 had in service that should have been Bill 9-1-1 charges but were not. And third, Level 3's incorrect argument that the district court's grant of summary judgment based on its resolution of contested facts should be afforded special deference instead of being reviewed de novo. First, the district's proper facts and inferences. In 2017, in reversing the same trial court's grant summary judgment in similar cases brought up against Bell South. Can I ask you, can I ask you a basic question that I'm struggling with? I don't see how Level 3 is even a service supplier. Are they providing local exchange telephone service? Yes, Your Honor. Yes, Your Honor, they certainly are. They are a licensed certificated carrier in Tennessee, a local exchange carrier in Tennessee. They are providing telephone services, local exchange services. They utilize a type of technology that is very common in the industry now, and they've made some issue of that, suggesting that that distinguishes them from Bell South, for example, that in the past they used copper-based technology. But it doesn't because the statute that is in question focuses on whether or not there's local exchange service provided. What that means is, is there a connection to the local exchange service that will permit the user to pick up the phone and dial 9-1-1. If that is the case, then the supplier is providing the local exchange service. The supplier is obligated to provide connections to 9-1-1 and is obligated to bill and remit the 9-1-1 charge. But it seems to me that the, do you agree that there should only be one charge per line that can call 9-1-1? Yes, Your Honor, I do. I believe that there should be. So if they're, if they provide wholesale services, then they shouldn't be paying anybody, right? Well, Your Honor, the record does not show that they provide wholesale services. In fact, the only evidence that they tried to put in the record is the expert testimony that was never disclosed, Mr. Robles to that effect, and statements in his declaration that were offered in support of the summary judgment. The record does not show that they were providing wholesale service of a type that is not billable because under the Tennessee Regulatory Authority rules, if they are providing service for resale by another carrier that is a non-facilities-based reseller, then that is subject to the 9-1-1 charge. The 9-1-1 charge has to be paid by somebody. And what the Tennessee Regulatory Authority established was, if a carrier sells a line to another company that is not a facilities-based provider, and that other company then provides the facility or the exchange access service, then the supplier originally, in this case level three, is liable for the charge. Somebody has to be. And, in fact, the argument was made, and the argument was accepted, and that factual issue was resolved improperly by the trial court. But, in fact, the record does not show that they were selling these lines to facilities-based carriers that were not subject to the 9-1-1 charge. I'm confused, though. Is it your position that every line that they reported on those activity reports, they are billing an end-user customer for and should be billing them a 9-1-1 charge that then gets remitted to you, and they're lying about it now? It's just a credibility thing? Well, there is a credibility issue here. And, unfortunately, that credibility issue has been resolved by the trial court. But, your honor, there are two types of customers that they could sell to for which level three is responsible for the 9-1-1 charge, either directly to an end-user, to a user as the service user, as the statute calls it, or to a reseller that then sells to a service user. And, in fact, what level three was doing was selling a lot of lines to service users that would have been resold. Those service users were not facilities-based resellers. And, the level three was responsible for the 9-1-1 charge as to those suppliers. So, your position is that they would sell to a service user, there would be a fee due to the districts, and then that service user would sell to the end-user, and there would be another fee, a similar fee, that would also go to the district? No, your honor, there'd be one fee. In this case, level three should have paid the fee, and they sold a line for resale. And, they did not. But, when it gets resold, and somebody gets billed, they won't have the 9-1-1 charge on it because it would already have been paid at a higher level? The reseller may pass it on, but the reseller does not remit a second 9-1-1 charge. If the reseller adds it on because it's one of their costs, then that's perfectly permissible. But, the reseller and level three don't remit two different charges. Can I ask just a basic question? I guess I analogize to the False Claims Act. We have a lot of cases on the False Claims Act and the pleading standards under Rule 9b for that, and one of the main requirements of pleading, so this is just at the complaint stage, is that when you have a broad-based theory like you do in this case, that you have to identify a specific claim, the person's name, the service date, whatnot, and explain why that specific claim was false. If you analogize that, we're at the summary judgment stage, and you can correct me if I'm wrong, but I haven't seen a specific example of, this service user was not charged the 9-1-1 fee, but the service user should have been charged that fee. And so, I'm struggling to see why, if at the complaint stage, the failure to identify a specific false claim would not even get you to discovery, why now that we're at the summary judgment stage, we still can't identify one specific false claim, why you should get a jury trial. Your Honor, the violation of the False Claims Act occurred when Level 3 submitted a remittance report to a district saying, we have billed all of the lines that are subject to the 9-1-1 charge, but that report was false. And the fact that they submitted a report in order to avoid the payment, or the passing along of something they had collected and should have been paid to the district, violated the false claim. Have you identified, so you have the theory that why it's false is because the wireless activity reports actually are accurate and they include every line that should have been charged. That's your theory, I know that there's a debate, but even looking at their billing receipts, I just don't see a record of one specific example, this customer received access from Level 3, the customer was not charged a 9-1-1 fee. Am I wrong in that respect, that you have failed to identify one specific example of a customer who was charged, not charged the 9-1-1 fee? Your Honor, I think there's two points that I would point out. I'm not going to suggest that the court is wrong, but that I would point out. Number one is the False Claims Act action does not require us to go beyond the remittance report to the specific party by name, that's all I'm asking. Your Honor, what we have identified is who submitted the false report, and that was Level 3. The false report is what is subject to... And the reason you say it's false is because it does not include other people that were charged by Level 3 that did not, that were provided access by Level 3 that did not receive this 9-1-1 charge. And my question is, can you identify one person who was provided access by Level 3, but did not, did not pay the fee? Your Honor, it's our belief that that is not necessary. It is the action of submitting the remittance report that violates the False Claims Act. And the False Claims Act on its face says, we have billed this many lines that are subject, and these are all of the lines that are subject to the 9-1-1 charge. And in fact, that was false, because they had not billed and remitted all the lines that are subject to the 9-1-1 charge. The False Claims Act does not require that the governmental entity go beyond the false report that was submitted to determine the granular detail of each of the reasons that it was false. It is the fact that it was false. And each of these reports, all of which are in the record, each of these reports were submitted and were certified as being correct. Each of these reports use language that made clear that they were representing that in fact they had billed all of the lines that were subject to the charge. Thank you. Thank you, Mr. Hitchcock. And you'll have your full rebuttal time. We'll hear now from counsel for the appellee, Ms. Kelly. May it please the Court. I want to address some of the questions that Your Honors had for the theory in this case. So this is an extraordinary case because the districts do not have a single witness. And Judge Murphy, as you noted, they have sued Level 3 for more than $10 million of failed 9-1-1 charges that they claim Level 3 failed to bill to their customers without pointing to a single instance where Level 3 billed an incorrect 9-1-1 fee. What they've tried to do is prove this indirectly through the wireline activity reports. These reports are a voluntary form that everybody agrees have nothing to do with 9-1-1 charges and have never been used in this manner before. And what the plaintiffs have done throughout this case, because they have no witnesses, because they have no proof, they have no facts, they have tried to correctly recognize that that was improper. Because Level 3 does not have to explain why the wireline activity reports don't match the 9-1-1 remittances. It's the districts that have to explain why those two things should be the same. And there's essentially three reasons why you can't use the wireline activity report as a proxy for the number of 9-1-1 charges that Level 3 should have billed. The first reason is because Level 3 is not a traditional telephone company. 9-1-1 fees only apply to local exchange two-way voice that can call 9-1-1. That's not what Level 3 sold. Everyone, there's no dispute that the charges do not apply to inbound only. They don't pay something to the districts though, right, over this time period. I mean, there were some lines, or there was some theory under which you thought that you were obligated to pay. So, are you admitting that you're a service supplier under the statute, and it's just a matter of how many lines there are that you would have to make that charge for? I mean, why isn't it then up to you to tell us why or why it doesn't apply? You're correct that Level 3 doesn't fit the definition of a service supplier because they are a voice provider. And we made that argument at the trial court in our summary judgment motion. The judge found that he didn't need to reach that issue because he granted a summary judgment. If this court were to reverse, that would be something that the trial court would need to determine. But this case predates the amendments to the 9-1-1 Act that added voice providers. So, when Level 3 went into business in the early 2000s, the 9-1-1 Act didn't address what voice providers were supposed to do. And so, what Level 3 did is, out of an abundance of caution, they charged 9-1-1 fees to the very percentage of their customers that had two-way voice that could call 9-1-1, and they remitted those fees to the districts. And what happened is, when the 9-1-1 Act was amended to tell the voice providers to send that money somewhere else, Level 3 did not change its practices and continued to just remit to the districts. And that was... Can I ask just a... Sorry to cut you off. If... So, I guess the best argument in response to my point about not being able to identify a single person is the notion that you kind of refused to give them the discovery that they needed in order to make the determination. I wonder if you could just talk about that a little bit, as I understand their argument, is that the bills that you provided them... I understand you have, I guess, 10 years. But that information, the spreadsheets that they got, they couldn't tell if on a line-by-line basis, whether this particular line should have been billed the 9-1-1 fee. Or if you could just... Sure. We did produce 130 months of billing records. And what these were, were downloads from the billing system. And they list for each month, every customer, what that customer purchased, whether 9-1-1 fees were assessed on that customer, and if so, how many. And what the districts have said is that there's a very small percentage of those 9-1-1 records that are not adequate to do what they want to do. And it's actually less than 1%, because the only 9-1-1 fees that were billed are the ones to the retail customer portion of a single product, Enhanced Local Service, or ELS. And that is less than 1% of the services that Level 3 provided during this time period. So, it's a very small portion of the billing records that the districts claim are inadequate. They also... We produced those billing records in two installments, one in November and one in May. The districts did not attempt to notice any depositions of a Level 3 witness until September, the month when discovery ended. So, the reason that they claim that they ran out of time to file a motion to compel us to produce additional billing record information is because they waited so long to take their deposition. So, the billing records... And it's important to note that the trial court specifically noted this dispute about the adequacy of the billing records. And the trial court found that it was subcategory that the districts claim. The districts still don't have any evidence to show that the wireline activity reports are an accurate way to measure the number of 9-1-1 fees that Level 3 should have remitted. How long... So, how long did they have the billing... How long did they have between your production of the billing records and the end of discovery? So, discovery ended at the end of September. We produced the billing records in two installments. The first installment was the previous November, and the second installment was May the 1st. Okay. So, they had all summer to take depositions of any of our witnesses about the billing records. Did they send you any interrogatories about the billing records or any document requests or any other discovery about those records? No, Your Honor. They made no attempt to get additional information at all. And they claimed that they discovered that the billing records were inadequate at that September deposition that was taken right before discovery closed. But the reason that that deposition wasn't taken until then is because it wasn't noticed before then. So, the billing records say whether a 9-1-1 charge was charged to someone. So, the billing records presumably tell you how many potential lines there are that could have been a problem, let's say, from their perspective because there was no charge made. So, I take it it was then incumbent, your argument is it was incumbent upon them to investigate further about why there was no charge on these lines that weren't charged? Yes, Your Honor. Well, and remember that the pertinent question in this case is, can you connect the wireline activity reports to the 9-1-1 charges? And the reason you can't for Level 3 is that over 99 percent of what Level 3 sold was not subject to 9-1-1 charges. And the one thing that the districts have never responded to is even if the billing records were inadequate to do a full audit of the 1 percent that we did charge 9-1-1 fees to, even if that inadequacy exists, the billing records still demonstrate that most of what Level 3 sold wasn't subject to 9-1-1 charges. And Level 3 on its wireline activity reports reported statistics for all of the services that it provided, not just the ones that were 9-1-1 taxable, plus the services provided by three other separate non-defendant companies in the Level 3 corporate family. And so, those billing records definitively established that the wireline activity reports cannot be used as a proxy for the number of 9-1-1 charges that Level 3 should have billed. So, but, and the court recognized that. The court recognized that the billing records were immaterial because the districts have no way to connect these two things. And what they've done throughout the case is try to shift the burden of proof to Level 3. One of the ways that the Districts have done that is they've created a section under Rule of Evidence 10-04. They argue that they should be able to admit the wireline activity reports with no witness, no supporting witness, as secondary evidence of what our billing records should have shown. But Rule 10-04 requires that the originals be lost or destroyed. These originals weren't lost or destroyed. We produced them. We produced 130 months of them. What the districts are arguing is that they should be able to presume that the records were lost or destroyed because they were inadequate and because the districts ran out of time to file a motion to compel due to their own delay. And they cite no authority for that proposition whatsoever. So, the 9-1-1 charges Level 3 should have remitted. The first reason is Level 3 reported statistics on all of its services, not just the ones that can call 9-1-1 and are subject to the 9-1-1 tax. And the second reason is the reports were consolidated in that they included not just Level 3, but also the services sold by three other separate companies in the Level 3 family. And former TRA Director Dr. Roberson testified this is a common practice in the telecom industry. And then the third reason that you can't use these wireline activity reports as a proxy for 9-1-1 charges is 9-1-1 charges are assessed on access lines. And what Level 3 was reporting on these wireline activity reports for the majority of this 10-year period were telephone numbers. And the reason Level 3 reported telephone numbers is because, again, these wireline activity reports were created before there was such a thing as a VOIP provider. And they don't give any direction on how a VOIP provider, who doesn't have lines in the traditional sense, is supposed to fill out this voluntary form. Can I ask you about that? Can I ask you about the telephone number? I was curious about that. You said that you keep more telephone numbers than there are access lines. What does that actually mean? Does that mean that there's more than one telephone number per access line or that just there's a lot of telephone numbers not in service? No. It's in the context of business customers. And that's exclusively what Level 3 provides. So, if you have like a law firm and everybody has a direct dial, there's not a line connected with each direct dial number. So, you might have 100 direct dials where you can dial me at my desk in the law firm. But that law firm may only have 25 access lines going out because not all of those direct dial numbers are in use at the same time. Okay. So, that means that, would that actually mean if they all tried to use the phone, if every law firm lawyer used the phone at the exact same time, then some of them would be sold and that happens occasionally like during natural disasters where everyone tries to pick up the phone at the same time. But the Level 3's customers have vastly more telephone numbers than access lines or pathways. And to give you a sense of the scope of the difference, when Level 3 changed in December of 2011 from reporting telephone numbers on these equivalency, the count went from 70,000 to 7,000. So, those are the three reasons why these wireline activity reports don't give you any indication whatsoever of the 9-1-1 fees that Level 3 should have billed. And essentially what the districts are arguing is that they can at least five things. You have to ignore the TRA's instructions on how to fill out these wireline activity reports. All of Level 3's testimony about how they filled out the reports. You have to ignore all of Level 3's testimony about what services they provide and who their customers were. Ignore all but a few sentences of Level 3's discovery responses. Ignore 130 months of billing records. And ignore large portions of the district's own experts' report and testimony. And we would submit that that doesn't come close to meeting the requirements of Rule 56. And therefore, the trial court's decision should be affirmed in all respects. I mean, my understanding is that their expert, Gillen, when I looked at his report, I mean, he seemed like he made an assumption that just because Level 3 had a license to local phone service, that therefore everything on that wireline activity report was, should have been 9-1-1 charged. And I just, it seems like a stretch to me, but I don't know whether that presumption or something comes from someplace else that I'm missing. No, you're exactly right. And the reason is because Mr. Gillen had no reason to doubt the testimony of Level 3's representative. And what that representative said is the only companies that can use the type of products that Level 3 sold on a wholesale basis are companies that have their own facilities. Therefore, all of our customers were facility-based providers. And that's why we're not a service supplier. Great. All right. Thank you, Ms. Kelly. We'll hear a rebuttal now from Mr. Hitchcock. Thank you, Your Honor. I apologize. I didn't have the, I didn't have it unmuted. Let me address a few of the comments that Ms. Kelly made. First of all, there is a correlation that they admitted between the wireline activity reports and the number of lines that they billed customers. They said in the response to interrogatory number four, under oath, that they billed, used the telephone numbers to bill their customers for the lines that they provided. They said that they used the telephone numbers, the same telephone numbers, to fill up the wireline activity reports. Mr. Robles, in his deposition, he was their 30B6 representative. He said, he testified that, in fact, they used it for all of the purposes of telephone numbers. They used it to bill their customers. They used it to supposedly bill 9-1-1 charges, although not on all of them. And they used them to complete the wireline activity reports. That is their testimony. That is their admission. It was confirmed and ratified by Mr. Robles. It was confirmed and ratified in his testimony and in his declaration. It is admitted in several of their pleadings, as we point out in our briefing. Second, the idea that we somehow sit on our rights is just simply not true, Your Honor. They did not respond timely to the discovery. We had to file a motion to compel that they didn't respond to. And, in fact, the order went down, ordering them to compel without response. That is what happened between May, between May and, excuse me, between November and May, is the process to require them to provide they should have provided months earlier. Once you had the actual billing records and you knew that there were some lines that got charged 9-1-1 fees and some that were not, did you depose somebody on that or try to figure out what specific lines were not charged and why? Yes, Your Honor, we certainly did. And we deposed Mr. Robles, their 30B6 deponent. We also, in the interim, filed some additional discovery with them, second and third sets of interrogatories and requests for production that inquired about subjects such as these. What Mr. Robles said, and the assumption is very important that the court not had, what Mr. Robles said was you could tell from their billing records the lines that had been billed 9-1-1 charges. You could not tell from their billing records the lines that had not billed 9-1-1 charges. So, when we talk about 1004 in the application of the secondary evidence rule, it was applicable because they did not provide what the court ordered them to provide, and that is answers to our interrogatories that asked a simple question. How many lines did you have in service in each district each month? They said, we'll provide it in the spreadsheets, and the court included that in the order and ordered them to provide that in the spreadsheets. But Mr. Robles said they weren't there. And then he came back in a declaration, filed in support of this motion for summary judgment, and directly contradicted what he had said under oath. And that's some of the things that Ms. Kelly is relating to you. Many of the things that Ms. Kelly is relating to you are not in the record except through a declaration that he filed. What is the evidence? What is the evidence, I guess, that supports your experts' conclusion that every single line reported on the wireline activity report is a line that should have carried with it a 9-1-1 charge? I mean, that's what you're saying, every single one of them, right? It is, he cited in support of that, their admission in interrogatory four, in the response to interrogatory four, that there was a correlation between the number of telephone numbers used to bill their customers for lines in service and the number of telephone, or the same telephone numbers were used to complete the individual customers that were available. Yes, in fact, billing records do show individual customers that were billed 9-1-1 charges. That's what the spreadsheets show. They do not show lines on which the charges were not billed. What is that? It wouldn't be that when, if the billing records, you know, the people who were billed, when it just the record of the opposite, if it didn't have an indication, wouldn't that suggest to you that they were not billed? The lines just weren't there. When you add up the number of dollars that were reflected on the billing records, and that's what we were doing in May until we were able to take the deposition, in the interim, then you find out that the billing records just show the number of lines on which they remitted, not the number of lines on which they did not remit. Now, in fact, the delay between the period when we got the records and the deposition was taken up by the insistence of Ms. Kelly that they take depositions of 30 representatives of the 15 districts. That's what happened during that period of time. From May until September, we were examining those billing records, and we were determining what, in fact, was confirmed in September deposition of their representative. The billing records did not include the lines that were not charged, only those that were, leaving us with the necessity to use the secondary evidence. Okay, great. Thank you, Mr. Hitchcock. Thank you, counsel, for your arguments. The case will be submitted.